UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JENNFIER AND EUGENE WONG,

    Plaintiff,

    v.

SEATTLE SCHOOL DISTRICT,

    Defendant.

CASE NO. C16-1774-RAJ

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

## I. INTRODUCTION

On May 20, 2015, Plaintiffs Jennifer and Eugene Wong filed a Complaint against Defendant, Seattle School District No.1 on behalf of their son, J.W., a minor. Dkt. # 1. The Court heard this matter in a bench trial that began on October 23, 2018 and concluded on October 31, 2018. Dkt. ## 91-97. After stipulations and orders on motions in limine and a motion for partial summary judgment, the only issues remaining for trial was whether the School District discriminated against Plaintiff J.W. in violation of Section 504 of the Rehabilitation Act and the Americans With Disabilities Act ("ADA"), and whether J.W. suffered any emotional damage as a result of the District's actions. The trial included the testimony of several witnesses and the admission of various exhibits into evidence. The parties also submitted proposed findings of fact and conclusions of law. Dkt. ## 88, 89.

ORDER – 1

Pursuant to Federal Rule of Civil Procedure 52, the Court enters the following findings of fact and conclusions of law. For purposes of organization and clarity, the Court has included some subsidiary conclusions of law with its findings of fact, and vice versa. **For the following reasons, the Court finds that Plaintiff failed to prove that the District violated Section 504 and the ADA with respect to J.W. by discriminating against J.W. either intentionally or with deliberate indifference. Plaintiff also failed to provide adequate evidence of J.W.'s emotional distress as caused by the District's alleged discrimination. Finally, Plaintiff has failed to establish a necessary basis for declaratory or injunctive relief. The Court finds for Defendant on all claims.**

## II. FINDINGS OF FACT

1) Defendant Seattle School District No. 1 (the "District") is the public school district for the city of Seattle. The District is a local educational agency ("LEA") within the meaning of the Individual with Disabilities in Education Act, 20 U.S.C. §1400, et seq. ("IDEA") and Section 504 of the Rehabilitation Act. As such, the District receives federal funds for educating children with disabilities within its boundaries. The District is also a "public entity" as defined by Title II of the ADA, 42 U.S.C. § 12131(1).

2) Plaintiff J.W. is a student with disabilities, who is diagnosed with autism, dysgraphia, language and communication disabilities (both auditory and recall), and a generalized anxiety disorder. He was found to be eligible for services by the District in the areas of Social/Emotional development, Adaptive Behavior, Communication Skills and Motor Skills. Ex. 259.

3) Plaintiffs Eugene and Jennifer Wong, J.W.'s parents, brought this suit on J.W.'s behalf. Dkt. # 1.

4) In 2009, at the age of four, J.W. was qualified as an individual with a disability under the IDEA under the category of autism. Dkt. # 60, Stip. Fact A.

5) In addition to autism, J.W. also has challenges with auditory processing, communication, word retrieval, and has a diagnosis of Dysgraphia, an impairment in writing. Dkt. # 91 at 77:19-78:16.

6) In 2009, at the age of four, J.W. enrolled in the District and qualified for special education and related services under the IDEA. J.W. attended West Seattle Elementary School in the Developmental Preschool within the District. Dkt. # 91 at 45:9-46:5. J.W. also attended "The Neighborhood Preschool," a private school, because the District's developmental preschool wasn't available full-time. *Id*. at 48:10-18.

7) The District had developed an Individualized Education plan ("IEP") for J.W. beginning in preschool and continuing to 2014. Dkt. # 91 at 45:20-25. Every IEP adopted for J.W. during the period of time that he attended Schmitz Park, from kindergarten through third grade, had annual goals that addressed his anxiety issues. Dkt. # 92 at 106:22-108:4; Ex. 259 at 6.

8) In the summer before kindergarten, J.W. received a private psychological evaluation at the CARE Clinic at the University of Washington. Dkt. # 91 at 50:16-25, 55:13-22; Ex. 93. The CARE Clinic diagnosed J.W. with Asperger's Disorder (DSM-IV Code: 299.80), a form of autism. Dkt. # 91 at 54:2-5; Ex. 93. The CARE Clinic evaluation also used the BASC-II assessment for J.W. Based on this assessment completed as part of the CARE Clinic evaluation, J.W. was determined to be in the at-risk range for hyperactivity, depression, and adaptability and as having clinically significant difficulties in the areas of aggression, anxiety, atypical behavior, and withdrawal. Ex. 93 at 6.

9) The professionals who evaluated J.W. also found that he was a "twice exceptional" child who was extremely bright but faced challenges with social functioning and distractibility. Dkt. # 91 at 61:3-13; Ex. 93.

ORDER – 3

10) After attending preschool in the District in 2009, J.W. started kindergarten in 2010 at Holy Rosary School, a private sectarian school in the parish where his mother worked. Dkt. # 91 at 65:20-66:4.

11) J.W. exhibited some behavioral issues at Holy Rosary. Dkt. # 92 at 115:9-21. Based on these issues, the Wongs began taking J.W. to a counselor. *Id.* at 113:16-22; Ex. 267. Within a month or two of his enrollment at Holy Rosary, the school informed the Wongs that J.W. could no longer attend school there. *Id.* at 112:8-113:4.

12) Upon leaving Holy Rosary, the Wongs enrolled J.W. in the District and he began attending in the fall of 2010 at Schmitz Park Elementary School ("Schmitz Park"). Dkt. # 91 at 69:8-20.

13) The District developed an annual individualized education program ("IEP") for J.W. in or about September 2013. Dkt. # 60, Stip. Fact D.

14) J.W.'s third grade general education teacher was Dorothy Wells. Prior to teaching general education, Ms. Wells was a special education teacher in the District for 12 years. She had experience teaching students with autism, and is the mother of two autistic children. Dkt. # 92 at 130:25-131:3; Dkt. # 94 at 7:4-14.

15) J.W.'s IEP for the 2013–2014 school year, when he was in third grade, was developed on September 23, 2013 by his IEP team, which included Mr. and Ms. Wong. The IEP states that the Parents were concerned about J.W.'s social skills, including self-regulation, cooperation with peers, and empathy. Ex. 259 at 2. The IEP contained several social and behavioral goals directed toward improving J.W.'s peer interactions and anxiety management abilities, such as J.W.'s lack of understanding regarding personal space and other non-verbal social behaviors. *Id.* at 6. The IEP further provided J.W. with breaks when his frustration level rose, positive encouragement related to behavior and performance, and communication of clear behavior expectations. *Id.* at 8. It also

ORDER – 4

provided J.W. with 150 weekly minutes of specially designed instruction in the area of Adaptive/Life Skills and 60 minutes per week of specially designed instruction in the area of Social/Behavior. *Id.* at 11.

16) J.W. began receiving counseling from Dr. Erin Milhem, Psy.D., through her private practice in July 2013. Dr. Milhelm was on staff and part of the team that assisted at the CARE Clinic with Jensen's clinical diagnosis in 2010. She was his first assigned clinician after the 2010 clinical diagnosis. J.W. received counseling from Dr. Wilhelm in 2010 and 2011. Dkt. # 60, Stip. Fact I.

17) In October 2013, another student in J.W.'s classroom informed Ms. Wells of the existence of a "master plan" to get J.W. in trouble, involving several students in Ms. Wells' class as well as other third-grade students at the school. Ex. 41 at 2; Dkt. # 94 at 13:11-19, 42:8-43:20. The "plan" was to involve provoking J.W. in various ways in an effort to make him react badly so that he would get in trouble. Ex. 41 at 2. Ms. Wells told the student that the plan was not okay and held a meeting with J.W.'s class to help his classmates better understand his needs and to identify ways to address J.W. when he became dysregulated. Dkt. # 94 at 13:11-19; 42:8-22; Ex. 41. After the class meeting, J.W.'s classmates reported to Ms. Wells that they were having more successful interactions with J.W. at recess and they wanted to help J.W. stay regulated and be part of the class. *Id.* at 42:25-43:14. J.W. was not aware of the existence of the "plan." Dkt. # 94 at 13:20-22.

18) The District has a policy prohibiting harassment, intimidation, and bullying among students, employees, parents/legal guardians, volunteers, and patrons of District schools. Ex. 287. This policy was known as the "HIB" Policy.

19) Between November 7, 2013 and February 6, 2014, the parents of another student ("R.P."), the Pontrellis, filed eight HIB complaints with the District regarding J.W.'s conduct. Dkt. # 60, Stip. Fact O. Mr. Kischner performed the fact-finding investigations in relation to the HIB complaints. Dkt. # 94 at 65:16-66:6. He

recorded his investigatory notes in PowerSchool, a new software program the District began using that school year. *Id.* at 66:24-68:8. Due to the manner in which Mr. Kischner saved his investigation notes in PowerSchool, any attempt to print them resulted in the notes printing on a template entitled "Notice of Disciplinary Action." *Id.* at 68:9-69:20.

20) The first alleged incident took place on November 7, 2013. Ex. 276. Mr. Pontrelli filed the incident report on November 14, along with the second, third, and fourth incident reports. In the report, Mr. Pontrelli alleges that two other students held R.P. while J.W. kicked her. *Id.*; Ex. 41 at 2. At trial, Ms. Wells testified that she did not believe that J.W. had kicked R.P., and that she believed R.P. occasionally was "picking and prodding" at J.W. Dkt. # 94 at 16:15, 17:8-15. An investigation by school staff did not substantiate the details of this alleged incident. Ex. 219 at 4.

21) The second alleged incident took place on November 8, 2013, during a class field trip to the Burke Museum at the University of Washington. Ex. 87 at 25; Ex. 219 at 1; Ex. 277. Mr. Pontrelli was present on the trip as a chaperone. Ex.87 at 25. Mr. Pontrelli alleged that J.W. assaulted R.P. twice during the trip, and threatened her life. The first alleged altercation was on the bus at the beginning of the trip. Ex. 4. J.W. allegedly pinched R.P. on the arm when she leaned over him from another seat. Ex. 4; Ex. 277 at 2. Mr. Pontrelli did not observe the pinch himself, but was told about it by R.P. Ex. 87 at 2, 26. Mr. Kischner entered the details of the alleged event into the school's PowerSchool student information system, which generated a "Notice of Disciplinary Action" that went into J.W.'s academic file. Ex. 5.

22) Mr. Pontrelli claimed the third alleged incident took place on November 13, 2013. Ex. 278. In this alleged incident, District Physical Education teacher Carole Sealy stopped J.W. from "looming" over R.P. after she noticed R.P. making eye contact

ORDER – 6

with J.W. Ex. 239. Mr. Pontrelli claims that J.W. spoke the word "dead" to her, but Ms. Sealy has stated that she did not hear this. Ex. 87 at 30; Ex. 218 at 3. Ms. Wells, J.W.'s and R.P.'s teacher, talked with R.P. after the incident and reminded her that not everyone has the same social skills and that R.P. can't be friends with everyone. Ex. 239. Ms. Wells noted that R.P. agreed to leave J.W. alone in the future. *Id*. Mr. Kischner entered the details of the alleged event into PowerSchool, which generated a "Notice of Disciplinary Action" that went into J.W.'s academic file. Ex. 17.

23) Mr. Pontrelli claimed the fourth alleged incident took place on November 15, 2013. Ex. 279. Another student allegedly lured R.P. behind a portable classroom, saying "J.W. wants you." Ex. 218 at 3. R.P. went to J.W., who allegedly said "You're dead." *Id*. When Principal Kischner interviewed R.P. about the incident on the evening of the 15th, she told him that "she quickly forgot that it had happened." Ex. 205 at 1. Mr. Kischner entered the details of the alleged event into PowerSchool, which generated a "Notice of Disciplinary Action" that went into J.W.'s academic file. Ex. 10.

24) Mr. Pontrelli claimed the fifth alleged incident took place on November 18. Ex. 280. J.W. allegedly approached R.P. from behind, turned her around with his hands on her shoulders, pushed her, and said "I will kill you." Ex. 13. Ms. Wells, J.W.'s and R.P.'s teacher, stated in an email that she couldn't see "how he managed to sneak that one in," because very little time had elapsed between when she was working directly with J.W. and when R.P. reported the alleged threat. Ex. 42 at 1. The District told the Pontrellis that the incident had been substantiated, but Principal Kischner later noted that the action had not in fact been corroborated by any witnesses. Ex. 13; Ex. 219 at 4. Mr. Kischner entered the details of the alleged event into PowerSchool, which generated a "Notice of Disciplinary Action" that went into J.W.'s academic file. Ex. 15.

25) On November 17, 2013, Mr. Kischner contacted the Wongs to discuss the HIB complaints. Ex. 206. He informed them that the Pontrellis were demanding that J.W. be suspended from school, but that he refused to do so. *Id.*; Dkt. # 94 at 132:11-15. On the same day, Mr. Kischner also informed the Pontrellis that he would not allow their "presence as classroom or school volunteers because that could interfere with the safety and privacy of [J.W.]" and that he would have them removed from the school premises if they attempted to interfere in J.W.'s education program. *Id.* at 130:12-131:13; Ex. 205.

26) After these initial HIB reports were filed, Ms. Wells asked Mr. Kischner for an emergency instructional assistant to be assigned to act as an additional adult to ascertain whether the alleged behavior of R.P. was occurring. Dkt. # 94 at 19:5-14. Mr. Kischner and Ms. Wells then informed an instructional assistant who monitored recess, Craig Garretson, of the concerns regarding R.P. and J.W. and asked that he closely monitor their interactions. *Id.* at 21:1-4, 37:25-38:5; Ex. 114. Mr. Garretson had previous experience working in an autism program in another school district and, in addition to monitoring recess, provided J.W. with one-to-one assistance in the academic area of writing. Dkt. # 94 at 38:23-39:11.

27) Mr. Kischner also requested additional funding for an emergency instructional assistant from the District's central office to deal with the developing situation between the Pontrellis and J.W. Dkt. # 94 at 145:17-146:22. On or about January 2014, the District assigned J.W. with a one-to-one emergency instructional assistant. Dkt. # 60, Stip. Fact N.

28) Mr. Kischner sent the Wongs an email on Monday November 18, 2013 which stated that Sylvia Johnson, one of J.W.'s special education teachers, was working closely with J.W. to identify behaviors that were "against the law," and that the school team needed to continue working with J.W. "on the way he appears to be using his body to intimidate others." Ex. 206; Dkt. # 94 at 133:8-25. He

ORDER – 8

explained that Ms. Johnson had named this behavior "looming" and that he had personally witnessed J.W. looming over another student that morning. Ex. 206. He further explained that some students may find the looming behavior scary. In addition, Mr. Kischner informed the Wongs of the HIB complaint R.P.'s parents filed on November 18, 2013. *Id.*

29) The District developed a Targeted Student Support Plan for J.W. in November 2013. Dkt. # 60, Stip. Fact. M. On November 25, 2013, J.W.'s IEP team met and developed a new functional behavioral assessment ("FBA") and Behavioral Intervention Plan ("BIP") to address his behavioral challenges. Exs. 50, 257, 258. This BIP addressed negative self-talk, work refusal and elopement. *Id.*

30) The behavior identification method that Ms. Johnson developed for J.W. was a five-point scale to address his behavioral challenges. Ex. 1. The scale identified J.W.'s threatening language and looming behavior as level five behavior that was "against the law." *Id.* Ms. Wells believed that phrase was appropriate because J.W. was very literal and this was the type of language he used. Dkt. # 94 at 24:2-14; *see also* Dkt. # 92 at 109:20-22; 125:19-126:8. The five-point scale also provided for J.W. to complete a self- reflection sheet once he was calm after a "level five" incident, and provided him with the option of going to the principal's office because it was a quiet space where he could further calm down. Ex. 1; Dkt. # 94 at 34:23-35:3; 36:6-12.

31) Also on November 25, 2013, Ms. Wells spoke with the Wongs regarding ways to help J.W. regulate his behavior without him needing to leave the general education classroom. Ex. 211. The Wongs recommended having him listen to classical music when he experienced stress. Ms. Wells agreed with the strategy and coordinated with Ms. Johnson to provide that accommodation to J.W. *Id.*

32) Ms. Wong sent the new FBA and BIP to Dr. Milhem, who reviewed the documents and discussed them with Ms. Johnson. Ex. 212. Dr. Milhem reported

to Ms. Wong on December 11, 2013 that Ms. Johnson was great and open to her suggestions. *Id.* She further reported that the she liked the BIP, that "things look really good," and that she and Ms. Johnson added the consequence of requiring J.W. to complete a reflection sheet if he engaged in work refusal to discourage him from avoiding work. *Id.*

33) On or about November 21, 2013 the District issued a "Targeted Student Support Plan" for R.P. Dkt. # 60, Stip. Fact. G. The plan largely involved informing District staff members when she felt threatened or unsafe.

34) Mr. Pontrelli claimed the sixth alleged HIB incident took place on December 10, 2013. Ex. 281. J.W. allegedly approached R.P. at recess and made a throat-slashing gesture toward her. Ex. 280 at 3-4. An investigation could not substantiate the details of the alleged incident. Ex. 219 at 4.

35) Mr. Pontrelli claimed the seventh alleged incident took place on December 11, 2013. Ex. 19. J.W. allegedly approached R.P. again and made another throat-slashing gesture toward her. Ex. 218 at 3-4. An investigation by school staff could not substantiate the details of the alleged incident. Ex. 219 at p. 4.

36) On December 12, 2013, R.P.'s parents sent Mr. Kischner an email to request revisions to the November 21, 2013 safety plan that had been developed for R.P. pursuant to the District's HIB procedure. Ex. 213. The e-mail mentioned that the Pontrellis were considering seeking a restraining order against J.W. but wanted to meet with the Wongs. *Id.* On the same day, Mr. Kischner forwarded this e-mail to Eugene Wong, and included a description of the Pontrelli's latest allegations. *Id.* Mr. Kischner requested further communication with Mr. Wong to determine "how such a meeting could take place productively." *Id.*

37) In an email dated December 16, 2013, Eugene Wong requested, among other things, that R.P. be moved out of J.W.'s classroom and made a request to the District regarding J.W.'s entire disciplinary record. Dkt. # 60, Stip. Fact K. Mr.

Kischner responded to Mr. Wong that he would schedule a safety plan meeting for J.W. Exs. 217, 221. The safety plan meeting was initially scheduled for Friday, December 20, 2013, but it had to be postponed until after winter break due to snow. Ex. 221.

38) In January 2014, Dr. Milhem offered recommendations to the school regarding how to strengthen the BIP and change the language that's specific to a child with Autism, based on the information that she had regarding his behaviors in the classroom. J.W. continued to escalate and demonstrate high anxiety levels, in terms of his dysregulation. In response, Dr. Milhem worked more extensively on emotion-regulation strategies by helping J.W. first notice and be aware of his emotions and their intensity, then noticing common situations that provoke those feelings, and then working on making plans to cope for when he felt his stress increasing. Exs. 54, 261; *see also* Dkt. # 93 at 104:4-12.

39) On December 19, 2013, the staff at Schmitz Park showed J.W.'s class a documentary, titled "Intricate Minds," that addressed non-neurotypical students, and held a class discussion regarding the different gifts and challenges students have and how the all students could work together to celebrate each other's gifts and to help each other with their challenges. Exs. 218, 231. The documentary film was subsequently shown to the other third grade classes at the school and the students from J.W.'s class lead the other classes in discussions regarding the video. Ex. 231. Prior to showing the film, the school provided the video to the Wongs, and they had no disagreement with showing the film. Dkt. # 92 at 132:3-8.

40) On January 2, 2014, Mr. Kischner informed Mr. Wong that he had considered his request to move R.P. to another classroom, but determined that moving her by means of involuntary transfer would not serve the interests of either student. Ex. 221.

ORDER – 11

41) In January 2014, Ms. Wells took steps to limit R.P. and J.W.'s interactions while they were in her class. Specifically, she moved R.P.'s desk so that it was far away from J.W.'s desk, which she did not move. Ex. 114 at 49-50; Dkt. # 94 at 59:6-23. Ms. Wells also arranged the desks so that J.W. did not face R.P., made sure they were separate from each other when lined up to enter the classroom, and permitted J.W. to enter the classroom prior to his classmates to reduce any transitional interactions. Ex. 114 at 49-50; Dkt. # 94 at 59:17-23.

42) On January 6, 2014, Beryl Miller, the District's HIB Compliance Officer, issued a letter to R.P.'s parents in response to their HIB complaints. Ex. 220. The letter summarized the District's findings and its determination of whether the alleged conduct qualified as HIB under the District's policies and procedures. Based on the investigation of the allegations in the complaints, the District concluded that R.P. was subjected to HIB based on J.W.'s conduct on November 8, 13, 15, and 18, 2013. Ex. 220. It determined that the allegations by R.P.'s parents related to J.W.'s conduct on November 7, 2018 and December 10 and 11, 2018 were unsubstantiated. *Id.* The District concluded that several remedial measures had already occurred at the school, including the screening and discussion of the "Intricate Minds" documentary, and provided for additional remedial measures. *Id.* The Pontrellis appealed these determinations. Ex. 223; Dkt. # 95 at 88:5-12.

43) A student safety meeting was held for J.W. on January 10, 2014. The meeting attendees developed a "Targeted Student Support Plan" for J.W. that provided an instructional assistant and called for his FBA and BIP to be reviewed and updated. Dkt. # 60, Stip. Fact M; Ex. 22. The Wongs expressed that the meeting was productive and that the safety plan was appropriate at the time. Ex. 54; Dkt. # 2 at 142:13-20. At this meeting, Mr. Kischner provided the Wongs with copies of his investigatory notes, which printed out as "Notice of Disciplinary Action." Exs. 54, 221; Dkt. # 4 at 81:3-15; Dkt. # 95 at 122:21-25. This was the first time the

Wongs received copies of these "Notices of Disciplinary Action." Dkt. # 60, Stip. Fact Z.

44) In accordance with his safety plan, Schmitz Park provided J.W. with an instructional assistant, Mr. Frank Robertson, on January 13, 2014. Ex. 222. Mr. Robertson's duties were to support J.W. in the classroom and on the playground and to assist in the development of a new FBA and BIP. Dkt. # 94 at 123:13-124:4. District staff worked with Ms. Wong over the following weeks to determine what data Mr. Robertson would collect regarding J.W. Exs. 225, 226, 227.

45) At this point, the Wongs and Dr. Milhem both reported noticing higher levels of stress and anxiety in J.W. By February, Dr. Milhem testified that J.W. was increasing his use of "stimming" at school as a way to self-regulate. Dkt. # 93 at 110:14-111:10, 117:24-118:16. According to Dr. Milhem, when stimming, J.W. would say things such as "I'm going to kill you with my lightsaber," which was J.W.'s way of communicating that things were not going well and he did not like what was going on. Dkt. # 93 at 116:21-117:4.

46) In February, Mrs. Wong testified that J.W. also stated in a car ride after coming back from a group play therapy session, J.W. stated that he wanted to throw himself off of a bridge. Dkt. # 92 at 64:20-66:8. After this, Dr. Milhem saw J.W. again, and testified that he was extremely dysregulated, that she was worried for his safety, and that it was very difficult to get through to him in therapy. Dkt. # 93 at 110:7-9, 111:1-5.

47) R.P.'s parents filed another HIB complaint against J.W. on February 6, 2014. Dkt. # 60, Stip. Fact O. This complaint alleged J.W. directed another student to "execute" R.P. during school on February 6, 2014. Exs. 20, 232. J.W. was with another student at recess and allegedly told her to "go execute" R.P. Exs. 20, 232, 240 at 1. According to the other student, this was related to J.W. sometimes liking

to play "evil third grader" and "rebel." *Id.* The District investigated the February 6, 2014 HIB complaint and substantiated this incident, which it found to constitute HIB. Ex. 33. Mr. Kischner entered the details of the alleged event into PowerSchool, which generated a "Notice of Disciplinary Action" that went into J.W.'s academic file. Ex. 21.

48) R.P.'s parents applied for and received a temporary restraining order ("TRO") against J.W. on February 7, 2014 under King County Superior Court Cause No. 14-2-04376-7. The TRO restrained J.W. from attending Schmitz Park Elementary School and ordered that J.W. be transferred to a different school. Despite the TRO not being served on J.W.'s parents, the District issued an emergency exclusion against J.W. and informed the parents J.W. could not attend school. Dkt. # 60, Stip. Fact P.

49) Upon receiving a copy of the TRO, Mr. Kischner sent Ms. Wong a copy of the TRO the same day and informed her that the school was required to issue an emergency exclusion and hold a manifestation meeting with J.W.'s IEP team. Ex. 234. When J.W.'s IEP team gathered for the scheduled manifestation determination meeting on February 10, 2014, Mr. Kischner informed the Wongs that a manifestation determination meeting was not necessary because the school was not excluding J.W. Dkt. # 92 at 76:15-77:2; Dkt. # 94 at 127:14-128:2; Dkt. # 95 at 149:13-150:11. At the meeting, the District offered to provide J.W. with daily tutoring while the restraining order was in place and agreed to develop a BIP to address J.W.'s aggressive language. Ex. 111; Ex. 262 at 5; Dkt. # 92 at 77:8-15. The IEP team developed a BIP that identified J.W.'s target behavior as "negative or aggressive talk and intimidating gestures that make others feel unsafe." Ex. 111. The BIP provided for teaching replacement behaviors, whole class social skills instruction to address other students' behavior that may

contribute to J.W.'s target behavior and provided for reinforcement for J.W. when he engaged in socially appropriate coping strategies. *Id.*

50) On February 14, 2014, the District issued a letter to R.P.'s parents that denied their appeal of its prior HIB investigation and determinations. Ex. 33. The letter also informed R.P.'s parents that their February 6, 2014 allegation related to J.W.'s conduct was substantiated. *Id.*

51) On February 15, 2014, Mr. Kischner responded to feedback on J.W.'s FBA and BIP that he received from the District's safety and security department. Ex. 69. Mr. Kischner testified that he was receptive to the input, but he knew that the issues needed to be mediated at the school level and it was his role to ensure the safety of both R.P. and J.W., balancing both safety concerns and concerns with J.W.'s special educational needs. Dkt. # 94 at 117:23-118:4; 138:14-21; Ex. 69. Mr. Kischner responded and emphasized that he needed to serve the needs of both children, and that he planned to move forward with an approach that he judged to be appropriate for both students. *Id.*

52) On February 18, 2014, the TRO was reissued through February 25, 2014. Dkt. # 60, Stip. Fact Q.

53) On February 24, 2014, before the TRO was quashed, the District transferred R.P. out of J.W.'s classroom in anticipation of his return to school. Dkt. # 60, Stip. Fact S.

54) A further hearing on the temporary order for protection against J.W. was held on February 25, 2014. Ex. 87; Dkt. # 94 at 139:14-142:21. Mr. Kischner and Ms. Wells voluntarily testified in support of J.W. and against the extension of the temporary protection order. Ex. 87; Dkt. # 92 at 79-80. J.W.'s second grade and kindergarten teachers, along with his third-grade instructional assistant, provided declarations in support of him. *Id.* The District also provided 2 hours of tutoring

per day for two weeks prior to the quashing of the TRO on February 24, 2014. Dkt. # 60, Stip. Fact U.

55) The TRO was dismissed by King County Superior Court Judge Monica Benton, and the Pontrellis' request for a permanent restraining order was denied. Dkt. # 60, Stip. Fact R. The court concluded that, due to J.W.'s age and disability, he did not possess sufficient awareness of his conduct for it to satisfy the applicable criminal statute, and that the school was the appropriate entity to address his conduct. Ex. 87 at 185-86.

56) Following the hearing, Mr. Wong emailed Mr. Kischner and expressed his appreciation for Mr. Kischner's and Ms. Wells' testimony at the hearing, to acknowledge that J.W. potentially could return to Schmitz Park as result of the court's ruling, and he affirmed his understanding that R.P. had been transferred out of J.W.'s classroom. Ex. 243. He also stated that J.W. missed Schmitz Park. *Id*. Mr. Wong also sent an e-mail to Ms. Wells stating, "Please know that [J.W.] misses being in your class, which means a lot coming from him!" Ex. 244; Dkt. # 93 at 7:2-9.

57) The District sent Mr. Wong an e-mail on February 28, 2014 with a plan regarding J.W.'s return to Schmitz Park Elementary for March 3, 2014. Dkt. # 60, Stip Fact V. The plan sought to minimize the potential contact between R.P. and J.W., ensure classroom and instructional assistant support for J.W. through March 28, 2014, and include specific plans for J.W. on reentry and upcoming field trips. Ex. 246.

58) J.W. did not return to Schmitz Park on March 3, 2014. J.W. has not attended Schmitz Park since February 6, 2014. Dkt. # 60, Stip. Fact T.

59) On March 5, 2014, Ms. Wong sent an email to J.W.'s private providers in which she stated that she and Mr. Wong had decided to place J.W. at the APL, a private school, and were exploring the option of litigating to make the District pay for the

placement. Ex. 248. She further explained that, in order to have the District pay for APL, they either had to provide the District with 10 days' notice of their intent to privately place him or prove that returning him to Schmitz Park would be emotionally harmful. *Id.* Ms. Wong stated that they needed the providers to provide expedited documentation that concluded that returning J.W. to Schmitz Park would result in emotional injury. *Id.*

60) On March 6, 2014, Mr. Wong informed Mr. Kischner that the Wongs were gathering input and guidance on the reintegration plan from J.W.'s providers, but did not mention the plan to move J.W. to APL. Ex. 247.

61) On March 9, 2014, Dr. Milhem drafted a letter stating that it would not be appropriate for J.W. to return to Schmitz Park. Ex. 249. Ms. Wong reviewed the letter and directed Dr. Milhem to make a number of changes, including adding a statement to the letter that J.W. "would be emotionally harmed if he returned to Schmitz Park"; adding a statement that her work with J.W. indicated that his stress and anxiety was caused by poor support in school most likely due to weak programing and untrained implementation; and eliminating sections of the letter that addressed the stress J.W. would experience if he was placed in a temporary placement. *Id.*

62) Also on March 9, 2014, the Wongs emailed Mr. Kischner and told him that the proposed reintegration plan failed to provide the necessary supports for J.W. Dkt. # 60, Stip. Fact W. One reason given that the transition plan was inappropriate was because it attempted to alter J.W.'s stimming behavior. Ex. 250. Mr. Wong's justifications also included the physical structure of the school building, the fact that some of J.W.'s classes were in portable classrooms, an apparent problem with the gender of J.W.'s assigned instructional assistant, and that staff were not appropriately trained. *Id.* He then cited to the letter Dr. Milhem wrote and revised

at the Wongs' direction for the proposition that J.W. would suffer emotional harm if he returned to school. *Id.*

63) Mr. Kischner responded to Mr. Wong's e-mail and stated that he would work to schedule an IEP meeting immediately to address the stated concerns, and expressed his wish that the Wongs attend the meeting. Ex. 250. Mr. Kischner stated that the District did not intend to prohibit J.W. from referencing Star Wars, but wanted to designate times in the day to focus on other matters. *Id.*

64) J.W.'s IEP team met on March 17, 2014 and discussed the need to revise the BIP to help J.W. learn safe language. The Wongs opposed this proposal. Ex. 251; Dkt. # 92 at 83:19-84:7.

65) The Wongs withdrew J.W. from the District, placed him at Yellow Wood Academy for the remainder of the 2013–2014 school year, and then enrolled him in APL at the start of the 2014–2015 school year. Dkt. # 60, Stip. Fact X, Y, CC.

66) The Wongs made a request for an independent education evaluation ("IEE") at District expense, in the Spring of 2014. The District filed Due Process against the Wongs pursuant to IDEA with the Washington State Office of Administrative Hearings) on or about June of 2014. The District alleged, inter alia, that the District's 2012 Tri-Annual-Re-Evaluation was appropriate and would defend the Re-Evaluation provided J.W. a free and appropriate education ("FAPE") under the IDEA during the 2012-2013, 2013-2014 school years. The District subsequently dismissed the due process action and paid for the IEE conducted by Dr. Alison Brooks. Dkt. # 60, Stip. Fact AA, BB.

67) The Wongs filed an IDEA action in March 2015 (OSPI Cause No. 2015-SE-0018), and alleged, inter alia, that the District violated the IDEA based on its provision of special education and related services to J.W. for the 2013–2014, 2014–2015, and 2015–2016 school years. Dkt. # 60, Stip. Fact DD.

ORDER – 18

68) On May 14, 2016, the administrative law judge ("ALJ") in the first special education case issued findings of fact, conclusions of law, and an order ("FFCL"). The ALJ determined that Plaintiffs prevailed and awarded remedies that included an order that the District reimburse Plaintiffs for J.W.'s private school programs (Yellow Wood and APL) and related services, such as counseling, for the 2013–2014, 2014–15, and 2015–2016 school years. Plaintiffs admit that they received these remedies. Dkt. # 60, Stip. Fact EE. The District has continued to fund J.W.'s education at APL since the ALJ's decision.

69) Dr. Alison Brooks is the cofounder of Brooks Powers Group, which provides psychological and educational services to children, their families, school districts, and other providers who serve those children. Ex. 312. Dr. Brooks conducted an evaluation of J.W. in July 2014, which was performed at the request of and paid for by the Wongs. Dkt. # 96 at 112:11-15; *see also* Ex. 96. In 2016, Dr. Brooks conducted a second psychoeducational evaluation of JW, which was paid for by the District. *Id.*; Ex. 274.

70) In the course of her evaluation of JW in 2014, Dr. Brooks diagnosed JW with generalized anxiety disorder ("GAD"), which is a diagnosis that is listed in the *Diagnostic and Statistical Manual of Mental Disorders*, Fifth Edition (DSM-5). Ex. 274; Dkt. # 96 at 122:6-127:12. The diagnostic criteria for GAD are, generally, worry or apprehension that occurs on more days than not; a pattern of which have been present for more than six months prior to the evaluation; and the worry or fear must interfere with the person's social or daily life functioning to a significant degree and in multiple settings.

71) Plaintiffs Jennifer and Eugene Wong filed this action on November 14, 2016 on behalf of themselves and as parents of J.W. Dkt. # 1.

72) Plaintiffs filed an Amended Complaint on March 23, 2017, alleging disability discrimination under of the Americans with Disabilities Act, disability

discrimination under Section 504 of the Rehabilitation Act, disability discrimination under the Washington state Law Against Discrimination ("WLAD"), common law negligence, and outrage. Dkt. # 9.

73) Plaintiffs Jennifer and Eugene Wongs' causes of action and claims for damages resulting from or related to their physical or mental health or any medical or mental health treatment, including but not limited to their claims for emotional distress, physical injuries, and treatment costs, were dismissed with prejudice based on Plaintiffs' voluntary stipulation of dismissal. Dkt. ## 23, 23.

74) Plaintiffs' claims under Washington state law under the WLAD and based on the common law theories of negligence and outrage were dismissed on partial summary judgment for Plaintiffs' failure to comply with the RCW 4.96.020. Dkt. # 29. Plaintiffs Jennifer and Eugene Wong's claims for associational discrimination under the ADA and Section 504 of the Rehabilitation Act were also dismissed. *Id.*

75) Pursuant to the Court's Order on motions in limine (Dkt. # 63), Plaintiffs were prohibited from offering evidence of or seeking actual damages (i.e. medical costs and compensatory education costs) or consequential damages (i.e. lost wages and additional insurance costs), and were allowed to offer evidence of general damages only in the form of emotional distress damages. Absent written consent from Defendant, Plaintiffs were also only allowed to offer as evidence of emotional distress damages documents that were properly produced to Defendant prior to the discovery cutoff date of November 13, 2017. Accordingly, the only issues that remained for trial were J.W.'s claim for emotional distress damages under Section 504 and the ADA and Plaintiffs' claims for injunctive relieve under the same statutes.

### III.   CONCLUSIONS OF LAW

**A.     The District is Not Liable Under Section 504 or the ADA**

1) Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Section 504 of the Rehabilitation Act provides: "No otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794.

2) The Court analyzes claims under the ADA and § 504 of the Rehabilitation Act together, because there is no significant difference in the analysis of rights and obligations created by the two Acts. *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1045 n. 11 (9th Cir. 1999).  Generally, the plaintiff must show that: "(1) he is a "qualified individual with a disability"; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Duvall v. County of Kitsap,* 260 F.3d 1124, 1135 (9th Cir.2001) (citing *Weinreich v. Los Angeles County Metropolitan Transp. Auth.,* 114 F.3d 976, 978 (9th Cir. 1997)).

3) A "public entity can be liable for damages under § 504 if it intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons." *Mark H. v. Lemahieu,* 513 F.3d 922, 938 (9th Cir. 2008).  To prevail on a Section 504 claim, "plaintiffs must prove a mens rea of 'intentional discrimination' . . . [and] that standard may be met by showing 'deliberate indifference,' . . . not only by showing 'discriminatory animus.'"

*Lemahieu*, 513 F.3d at 938 (quoting *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1136 (9th Cir. 2001)). Deliberate indifference requires both (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood. *See Duvall,* 260 F.3d at 1139 (citing *City of Canton v. Harris,* 489 U.S. 378, 379 (1988)). The Ninth Circuit further articulated the deliberate indifference standard in *Lovell:* "The first element is satisfied when the public entity has notice that an accommodation is required. The second element is satisfied if the entity's failure to act [is] a result of conduct that is more than negligent and involves an element of deliberateness." *Lovell,* 303 F.3d at 1056 (internal quotations and citations omitted). Under the second element of the deliberate indifference standard, "a public entity does not act by proffering just any accommodation: it must consider the particular individual's need when conducting its investigation into what accommodations are reasonable." *Id.* "Thus, a public entity can be liable for damages ... if it intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons." *Lemahieu,* 513 F.3d at 938.

4) There is no dispute that J.W. was, and is, a qualified individual with a disability. Additionally, it is undisputed that the District has received federal education funding with respect to J.W.'s Rehabilitation Act claim.

5) Plaintiff asserts the District acted with intentional discrimination or deliberate indifference in the following ways: (1) issuing the six "Notices of Disciplinary Action" against J.W. without notifying the Wongs; (2) issuing HIB findings substantiating some of the complaints made by the Pontrellis, including classifying J.W. as the "aggressor" student and R.P. as the "target" student; (3) retaining an emergency aide to "shadow" J.W. that was ostensibly for his benefit; (4) excluding J.W. from school under an "emergency exclusion" in response to the TRO; (5) calling a Manifestation Determination Hearing and then changing it

to an IEP meeting; (6) allegedly meeting with the Pontrellis to discuss J.W.'s educational placement; (7) allegedly attempting to change J.W.'s educational placement; (8) providing safety plans that protected R.P. but not J.W.; (9) not protecting J.W. from bullying and harassment by R.P. and her family; (10) developing and implementing a five-point scale for J.W.; (11) developing an inappropriate FBA and BIP; and (12) not having an adequate reentry plan for J.W. following the TRO period.

6) The Court finds that Plaintiff has failed to prove, via a preponderance of the evidence, that the District acted with intentional discrimination or deliberate indifference for these alleged acts. While the District did not achieve perfection in its treatment of J.W., Plaintiff has failed to prove that the District's conduct was more than negligent and involved an element of deliberateness. The record reflects a District that made multiple good faith efforts to make appropriate accommodations for J.W., efforts that were unfortunately hampered by the actions of third parties; namely, the Pontrellis.

7) First, Despite the issuance of multiple "Notices of Disciplinary Action" to J.W., the Court finds that the record fails to indicate that the District actually disciplined J.W. These "Notices" appeared to be form notices that were automatically generated by the recording of incidents in PowerSchool. Dkt. # 94 at 52:5–8, 125:14-18; 128:12-129:1. There was no evidence presented that these "Notices" were ever effectuated, or that J.W. was aware of them. There is little evidence in the record to indicate that the District ever took any additional disciplinary action as a result of these "Notices," and indeed never sent them to the Wongs or any other individuals to indicate that J.W. had been disciplined. These records were apparently kept by the District for administrative purposes. Any damage arising from these records would thus be inherently speculative and

not supported by any evidence presented at trial.[1]  The Court finds that the existence of these "Notices of Disciplinary Action" was thus not undertaken with deliberate indifference, and Plaintiff has failed to show how they denied J.W. a FAPE.

8) Second, the Court finds little evidence to indicate that the District discriminated intentionally or acted with deliberate indifference in substantiating some of the HIB complaints.  Plaintiff's main argument is that even if some of the events happened as described in the complaints, J.W. lacked the intent to harass, intimidate, or bully.  Even if this was true in a legal sense, it does not follow that the District was precluded from conducting HIB investigations into J.W.'s conduct.  Rather, as explained by District witnesses, the role of J.W.'s disability came into play in deciding what actions the District was to take in light of the investigation's result.  The District explains that this is because the HIB policy is designed to protect, not to punish.  The record indicates that the District did not discipline J.W. in light of the substantiated or unsubstantiated HIB complaints. Plaintiff has failed to provide evidence showing that these actions, i.e. "substantiating" some of the conduct descriebd in the HIB complaints through investigations, were improper.

9) Third, Plaintiff has failed to show evidence as to how the District intentionally discriminated or acted with deliberate indifference by hiring an instructional aide for J.W. following the HIB complaints.  Even if the request for an aide was driven in part by the HIB complaints, Plaintiff fails to show how hiring an aide constitutes discrimination or a denial of a FAPE.

---

[1]The Court is, however, concerned about District's record keeping system. Although the Court finds that the District did not discipline J.W., it also finds that J.W.'s school records contained misleading indications that he was disciplined. The PowerSchool records were each categorized as "discipline" and any attempt to print these records would result in a "Notice of Disciplinary Action" templated being generated. While this practice did not indicate discrimination or deliberate indifference in this case, the Court is concerned about the District's maintenance of records in students' files that convey the incorrect impression the student was disciplined.

ORDER – 24

10) Fourth, the Court finds that the District's "emergency exclusion" of J.W. from Schmitz Park for the period that the TRO was in effect was not undertaken with intentional discrimination or deliberate indifference. Given the court order directing that J.W. be excluded, the District did not act in bad faith or with deliberate indifference in following that order. Moreover, the record contains numerous indications that the District attempted to challenge the exclusion or lessen the impact on J.W.'s education. The District provided tutoring for J.W. during this time, and provided multiple District witnesses to testify on J.W.'s behalf in further TRO hearings. There is also little indication in the record that the District intended to discipline J.W. in any way as a result of the TRO once J.W. returned to school.

11) Fifth, Plaintiff has similarly failed to show intentional discrimination or deliberate indifference in Mr. Kischner initially calling for a Manifestation Determination Hearing, and then changing it to an IEP meeting. Although the Wongs spent time and energy preparing for this IEP meeting as if it were a Manifestation Determination Hearing, it is not clear how this implicates J.W. or the District's mental state in calling this meeting.

12) Sixth, there is little indication in the record that the District consulted with the Pontrellis as to J.W.'s placement, as Plaintiff indicates. It also does not appear from the record that the District ever attempted to change J.W.'s placement, despite investigating whether a change in placement of either R.P. or J.W. would be feasible. Ultimately, the District changed the placement of R.P., not J.W.

13) Seventh, while the District produced a safety plan for R.P. in response to the HIB complaints, this action was done pursuant to the HIB policy requiring such plans following complaints. R.P.'s safety plan did not involve punishing or discipling J.W. and was solely focused on R.P.'s safety. Moreover, upon request from the Wongs, the District developed a safety plan for J.W. that provided an

1   instructional assistant, among other actions.  The record indicates that the Wongs

2   participated in the creation of this plan and at the time approved of its directives.

3   Plaintiff fails to show how these actions indicate intentional discrimination or

4   deliberate indifference by the District.

5   14) Eighth, the Court finds that Plaintiff has failed to prove beyond a preponderance

6   of the evidence that J.W. suffered from disability-based peer-on-peer harassment

7   under Section 504.  Although the Ninth Circuit has not yet ruled on this issue,

8   courts in this District that have recognized a cognizable claim for peer-to-peer

9   disability-based harassment under Section 504 and the ADA have applied the

10   analysis for claims of peer-to-peer sexual harassment under Title IX of the Civil

11   Rights Act set forth by the Supreme Court in *Davis v. Monroe County Board of*

12   *Education,* 526 U.S. 629 (1999).  *See, e.g.*, *Held v. Northshore Sch. Dist.*, C13-

13   1548 MJP, 2014 WL 6451297, at *8 (W.D. Wash. Nov. 17, 2014) (citing cases).

14   Under *Davis* (as applied to peer-on-peer disability based harassment), a plaintiff

15   must then show that the school district had actual knowledge of the harassment

16   and was deliberately indifferent, the harasser was under the district's control, the

17   harassment was based on the victim's disabilities, and the harassment was "so

18   severe, pervasive, and objectively offensive that it effectively bar[red] the victim's

19   access to an educational opportunity or benefit[,]"  *Davis*, 526 U.S. at 650.

20   15) Here, while Plaintiff argues that R.P. "taunted" J.W. on several occasions,

21   Plaintiff has failed to provide evidence that R.P. targeted J.W. because of his

22   disability.[2]   Moreover, while the parties dispute the severity of the alleged

23   harassment by R.P., the record does show that the District was not deliberately

24   indifferent to the conflict.  District employees separated the students, held class

---

[2] While Plaintiff cites to the "Master Plan" incident as evidence of other students' targeting of J.W. based on his disability, the connection between this incident and R.P.'s alleged behavior is not apparent from the current record.  There is also little evidence in the record that this "Master Plan" ever resulted in actual documented instances of bullying after Ms. Wells engaged with the students who drew up the document.

28   ORDER – 26

discussions and provided parent-approved autism education sessions for students in the class, and kept the parents of both R.P. and J.W. informed as to the status and pendency of HIB complaints.

16) As for the Pontrellis themselves, Plaintiff fails to cite authority imposing liability on school districts for the actions of other students' parents. The actions of the Pontrellis in seeking a restraining order outside of school is not conduct that is "subject to the school district's control." *Davis*, 526 U.S. at 645. There is also little indication the Pontrellis' actions, while shockingly insensitive to J.W.'s disability, were directed at J.W. because of his disability. There is little evidence that the District encouraged in any way the Pontrellis unfortunate and misguided attempt to obtain a restraining order against J.W. excluding him from school. Rather, the record indicates that the District attempted to dissuade the Pontrellis from taking further action against J.W. District employees such as Mr. Kischner and Ms. Wells voluntarily attended the ultimate TRO hearing and testified on J.W.'s behalf and against the Pontrellis, and other employees submitted declarations supporting J.W. The District also took numerous steps to address the HIB issue, including developing and implementing a safety plan for J.W., providing instructional aide support to monitor any interactions between J.W. and R.P., keeping J.W. and R.P. separate in their classroom and eventually transferring R.P. out of the classroom, and informing the Wongs about the HIB complaints.

17) Next, Plaintiff has failed to show that the District acted with deliberate indifference or intentional discrimination by utilizing a "five-point scale" with J.W. that specifically categorized certain behaviors as "above the law." While the Court agrees that it is possible that the language in this scale could have been better formulated, the use of the scale does not evidence deliberate indifference by the District, and was implemented seemingly in good faith after consultation

with Ms. Wells and J.W.'s educational support group. Based on the record before the Court, it is not apparent that the use of the five-point scale evidences any intentional discrimination or deliberate indifference by the District.

18) Plaintiff has also failed to show how the District's proposed "reentry plan" denied J.W. access to a FAPE, or was undertaken with intentional discrimination or deliberate indifference. The District's proposed transitional plan was rejected for inconsistent reasons, and it is not apparent that the Wongs made a good faith attempt to negotiate with the District to fix the plan's alleged weaknesses. Communications between the Wongs, Dr. Milhem, and others following the TRO indicate that at that point the Wongs had already decided to move J.W. to private school and to attempt to get the District to pay for these educational costs. Exs. 248, 249. The District has already paid for J.W.'s schooling at APL starting with the 2014-2015 school year. The record also shows that the District's efforts to secure J.W.'s return to school following the TRO, while not perfect, were apparently done in good faith.

19) Accordingly, Plaintiff has failed to establish the District's liability under the ADA or Section 504.[3]

**C.    Plaintiff Has Not Proven J.W. Suffered Emotional Distress Damages as a Result of the District's Actions.**

20) Even if this Court found liability for the District under Section 504 or the ADA, Plaintiff has still failed to uphold his burden of proof on his only remaining damage claim: whether J.W. suffered emotional distress damages because of the District's alleged conduct.

21) During trial, Plaintiff offered the testimony of Dr. Milhem, who argued that the District caused J.W. emotional distress through their allegedly exclusionary

---

[3] The Court need not, and will not, address the District's arguments regarding statutes of limitations, as these arguments were not adequately raised at trial. Even if they were, because the Court is finding for the District, they are now unnecessary.

ORDER – 28

actions.  While Dr. Milhem credibly testified about her experience in treating J.W., her expert opinion as to the sufficiency of District policies, the District's actions, or causes of diagnoses she did not make is not deserving of equal weight. For instance, instead of producing her treatment notes with respect to J.W. to the District in discovery, she instead produced a six-page summary at her deposition that excised discussion about alternative causes for J.W.'s anxiety.  Dkt. # 93 at 66:2-67:5; 68:21-69:7, 178:5-183:10.  Dr. Milhem also permitted the Wongs to edit the letter to the District that stated it would be emotionally harmful for J.W. to return to school at the District after the temporary order for protection was lifted.  Dkt. # 96 at 78:23-82:19; Exs. 248, 249.  Finally, Dr. Milhem expressed her opinions about the District despite never observing J.W. in Schmitz Park and having limited interaction with the relevant District staff.  Dkt. # 93 at 130:20-131:15, 169:10-170:4; Ex. 212.  This gives the Court great pause that the opinions expressed by Dr. Milhem as to the cause of J.W.'s emotional distress reflect her unblemished and unbiased professional opinion.

22) Although Dr. Milhem and Plaintiff assert that J.W. has GAD as a result of the District's actions, the Court finds inadequate evidence in the record to support this claim.  The Court is more persuaded by the testimony of Dr. Brooks, the professional who diagnosed J.W. with GAD, who testified that GAD is not caused by environmental factors.  Dkt. # 96 at 129:6-130:21.  This indicates that the District's actions as reflected in the record before the Court were not a significant causing factor of J.W.'s GAD, and Plaintiff has failed to counter this testimony with evidence of such.

23) Plaintiffs remaining arguments that the District's actions in this case caused J.W. emotional distress are not well supported by causal evidence.  The record also indicates that J.W. was not aware of the "Notices of Disciplinary Action" or of the TRO itself.

ORDER – 29

24) Based on the evidence presented at trial, the Court concludes that Plaintiff has failed to prove that the District's alleged actions were the cause of J.W.'s emotional distress.

**D.      No Injunctive Relief Warranted**

25) Plaintiffs have also requested declaratory and injunctive relief from this Court directing the District to change its HIB policy, and to expunge J.W.'s record.

26) Plaintiff provides little in the way of legal authority for these requested actions.

27) The Court finds that Plaintiff's request for declaratory or injunctive relief is not adequately supported by facts in the record or justified by any provided legal authority.

28) Plaintiff has failed to present evidence that the District engages in widespread discrimination or deliberate indifference toward students with disabilities. Instead, the evidence indicates that the District's IEP/BIP process is available to all kids with special needs. There is little evidence in the record about how the District's policies apply to other students with special needs.

29) Moreover, Plaintiff provides no articulation of what language needs to be changed in the HIB policy, why it allegedly violates the Constitution, and what to change it to.

30) Plaintiff has also failed to show evidence on ongoing violations by the District.

31) Finally, Plaintiff fails to present evidence of irreparable harm with respect to J.W.'s school record.

32) Accordingly, the Court finds that Plaintiff is not entitled to declaratory or injunctive relief in this case.

## IV. CONCLUSION

For the reasons previously stated, the Court finds in favor of Defendant on all claims. The Clerk shall enter judgment for Defendant.

DATED this 7th day of June, 2019.

_Richard A. Jones_

The Honorable Richard A. Jones
United States District Judge